As a preliminary matter, there are motions pending before the Court that both parties filed. Would the panel like for us to address those? No. Okay. Then right to the merits, would the panel like for me to start with any particular issue? Counsel, you make your choices. We'll move you along if we think they're the wrong choices from our point of view. From our point of view, the foreseeability ruling is the most important here. Under Vassallo, the correct foreseeability ruling is, was the alleged risk of harm foreseeable to the defendant at the time of sale? The alleged risk of harm here is property damage to the town of Westport Middle School. So the question is, was that contamination foreseeable to Monsanto in 1969? The position that Monsanto took in You just skipped one step, because you went, was the contamination? What do you mean by contamination? Certainly. Monsanto sold a number of building products, including caulk, which was used at the middle school. No, it didn't sell caulk, as I understand it. I think it's, did it sell what went into making caulk? Did it ship out a bulk material, which was then used by fabricators to make the caulk? That's correct. So it's not as if Monsanto was making the caulk. It was selling a product, which was used by others to produce products. That's correct. Monsanto's PCB products, which are sometimes in our briefs referred to as were incorporated into caulk. It was then used in a number of buildings, including the middle school. Now, PCBs, by virtue of their chemical and physical properties, emanate out or volatilize out of caulk. And they attach to other surfaces, other walls, masonry, carpet, air, dust, etc. So by contamination, do you mean just the mere fact that PCBs would escape the caulk at any level? Yes or no? Yes. Yes? Yes. Okay, so that's the contamination they had to warn about would be simply knowing that it was foreseeable that PCBs might escape from the caulk. Might or would. Would. Would, Your Honor. It was undisputed. Would. And they knew that in 1969. We believe it was foreseeable to them in 1969. Because? I'm sorry. When you say foreseeable, just so I get this point, if it's foreseeable that it would, I take it that means it might? Yes. Okay. That's what you mean? Just to clarify, in Monsanto. Well, Monsanto's statement of fact in support of its motion for summary judgment, number 15, in the record at 1929, said all plasticizer formulators knew that all plasticizers volatilized out of end products, including PCB containing plasticizers. Okay. So to answer your question, it's more complicated than that. What year was that number 15? It said by, it said at all relevant times, including in 1969. Okay. So to go back to Judge Stahl's question about foreseeability, our argument is that based on what Monsanto's level of knowledge that it developed over the years, starting in 1930s with studies of PCBs coming out of lacquer, going to the 1950s with its own in-house studies of paints, rooms painted with PCB containing paint that it studied, and it showed three important facts. One, that PCBs came out of those paints into the air. Two, that the PCBs in the air persisted for at least one month, which was the period of study. And three, one employee called it, realized that that could create a hazardous condition, and Monsanto ultimately decided not to sell PCB plasticizers for use in paints. When was that? That was in the late 50s, maybe 1956. Sorry, I don't have the date right in front of me. So in addition, there are documents reflecting studies of volatilization from caulk that are the subject of our motion to supplement, so I won't address those any further. So the foreseeability evidence in the district court was looked at through the prism of was it foreseeable that PCBs would volatilize out of caulk at levels capable of causing human disease? And Westport's position was and is that in a property damage case, there is no requirement that a plaintiff demonstrate a level of causing human disease. There is no Massachusetts Supreme Court that requires that? When I have trouble with your arguments, not that I can't see an argument, but I'm not sure of the way you put it in the brief, the way you just put it. The mere fact that a PCB in a small amount escapes, why would that require you to remove the caulk, and therefore why would it cause property damage, unless one was concerned that the PCB escaping posed a risk to human health? I have a two-part answer for that. Again, it's complicated. The EPA regulations referring to PCB products at levels at 50 parts per million. But by 1969, there's no reg. So as of 1960, you're just now saying there would be a basis for thinking it would cause harm to human health. I'm asking, is 1969, before we even get to the question of whether there's evidence that PCBs escaping would be harmful to human health, in your briefing and the way you just put it, you seem to suggest it's irrelevant whether it would be harmful to human health, because it's a property damage case. Correct. But I don't understand that, because the only reason I can see to remove the caulk would be out of concern that the caulk, because it has PCBs escaping, might pose a risk to human health. Otherwise, why would anyone care if the PCBs escaped? I see your question. Okay. Part of the reason that Westport put in the public health evidence is to explain that its remediation efforts were necessary under Massachusetts law to recover damages. You're slipping off the topic, which is of concern to both Judge Barron and to me, which is the foreseeability question. Let's put aside causation-type issues. And he asked you point blank if you thought the error was the district court's link between the risks of off-gassing and harm to human beings. Could you answer that question? The error is as a matter of law linking those and requiring that proof of property damage always requires human health. The district court is not saying always. The district court is saying on the facts here. The mere fact that it was off-gassing or had the potential to off-gas isn't enough. I appreciate your question about the historical context. What she's also looking at is the evidence that Westport put in of Monsanto's knowledge from the 1930s, the toxic effects of PCBs, of the recognition in the 30s that it was a public health threat sufficient to cause... To employees, the people who were handling it. Correct. There was nothing then which suggested that people in a building could be affected. What they were telling people is if you were handling it, you had to handle it carefully in a certain way. That's correct. And that's actually part of Westport's argument is that there was never that warning given. That warning was given to the people who were using it in fabricating other products. There is no warning in this record whatsoever that says that once PCBs are used in an end product that they may come out into the air and contaminate the air. You said contaminate. That's the word that's bothering me. If it comes out into the air and it's no problem, you could use the word contaminate, you could also say escape. Sure. Fly around in them. You could use lots of different words. Some would sound worse than others. Contaminate is a powerful word because it suggests it's a problem that it's escaping and therefore there's property damage you better remediate. So the question is what evidence is there in the record that a jury could reasonably conclude could support a conclusion that Monsanto... Let's assume the evidence supports the idea that a jury could find Monsanto knew it would escape the caulk. What further evidence is there that Monsanto would have known that merely because it escapes the caulk that's a problem that they better warn people about? There is evidence that Monsanto knew that when its PCBs escaped from end-use products that they caused widespread environmental contamination. For example, one document refers to 1 million pounds per year of PCB being used in highway paint alone. The document goes on to say we can assume that all of that PCB winds up in the environment. So there was growing knowledge on Monsanto's part, recognition through the 1960s before these products were taken off the market, that their end-use products were releasing PCBs. So is this a fair statement of your view? I'm not sure it's actually articulating it, but maybe it is. But is this a fair statement? You're not denying there has to be some connection to harm to human health. Your quarrel is that the district court said you had to show that it was known how harmful the escaping PCBs would be to human health. And you're saying that's not true in a property damage case. As long as they knew that it could be harmful, they should have been warning people about the fact that it escaped. I would modify your question slightly and say that what the district court said was that Westport had to prove that the levels present at Westport were capable of causing human disease, which is more like a specific causation analysis for a personal injury case. Another part of your question asks how do we know this is a human health threat? In enacting the Toxic Substances Control Act... That's post-1969. That can't help you. I'm aware. It's the question of now. Why is there a public health threat right now at Westport? But that doesn't help you with the warning. You see, you've got to have them know that there was something to warn about. And the fact that now we know that you should warn about it can't help you tell you that you have to know then that you should have warned about it. I understand the question. There were no studies at the time performed on... regarding the levels of PCB that would volatilize out of caulk. In the Tana Lexington case, if I read it right, which was the same district court judge, it seemed like there was evidence that there just wasn't even technology capable of permitting a study to be done. One of our experts actually countered that. Is that right? That's in the record? In the record. It's Dr. Franklin Dorman, who's an analytical chemist. He said that technology was available. And I will make a distinction between the Lexington case. Part of what they were looking for was to certify a class based on air exposure. So they were couched more as a personal injury case than Westport is. But I do feel the need to draw the present attention to Westport's injury because there were no regulations until Tosca. And in enacting those regulations, the FDA...EPA said that an exposure above 50 parts per million is a public health hazard. And when did they make that determination? How many years after this particular pot was put together? Tosca was about 1976. Quite a long time afterwards. That's right. So don't we get back to the foreseeability question once again? Well, again, if we apply the correct foreseeability standard, was it foreseeable that PCBs would volatilize out of caulk and would move on to other building substances? Westport can't simply remove the caulk. It has to remove everything that the caulk has migrated on to. But why did they know that it was a problem that it was migrating? What is the evidence that they knew that the fact that it migrates is a problem? You're saying one piece of evidence is the fact that they thought they were going to stop making the paint before 1959 shows that they had some knowledge that these products that volatilize can be harmful. Is that one of the pieces of evidence you want us to look at? That's one piece. Is there anything else? Sure. There is evidence of persistence once PCBs come out. In 1969? Yes. Yes, Your Honor. That would have been in the record of evidence. Part of the paint studies, yes. Not the paint. Other products that they persisted. In fact, it's part of Monsanto's advertisement. These products don't oxidize, don't break down, don't hydrolyze. Now you're making an argument that they don't volatilize. I'm sorry. Not that they don't volatilize. That they don't break down. So Monsanto is arguing on the one hand, these products are so stable, they don't break down, they don't break down, they don't oxidize, they don't hydrolyze in water. They attach to dust. And so once they've attached to dust, they're in the environment circulating and recirculating as expert Dr. Herrick explained. Judge Barron has another question. Could you talk about the bulk purchaser point? Because unless you went on that, this may not matter. Isn't that right? Well, to some extent, yes. So just on that score, there's a question about whether you were able to identify any of the bulk sale, whether you were able to identify any of the end users of the product. And as I take it, there's no evidence that was put forward at the time that you had identified those end users, but maybe I'm wrong on that. No, that's correct. But one important step, if I may answer, is that in the record, there are letters that Monsanto sent to its customers. One of those letters went to PRC, who is the formulator the COC used at the Westport Middle School, and that was sent in 1969 or 1970. So that formulator we submit could have identified Westport as a customer and communicated that warning. The district court assumed it would be impossible for Monsanto to communicate any warnings and said that Monsanto could not use mass media approach. That does not follow the standards set out in Hoffman v. Houghton, which adopted Restatement 310, which says in certain circumstances, based on the magnitude of the risk, that public media dissemination may be appropriate and that the manufacturer does not have to warn its direct customer as long as it can communicate a warning. Does that answer your question? Okay. Thank you. We'll hear from your opponent. Thank you, Mayor. Please, the court. As your Honor's questions delineate, a duty to warn exists in Massachusetts only for reasonably foreseeable dangers. The district court decided this case based upon admissions of plaintiff's experts. There was no fact-finding. There was no weighing of evidence. And that was what we moved for summary judgment on, and that is what we rely upon in this court. Does your case depend at all on the correctness of the exclusion of that one expert's opinion? It does not rely upon that at all. That one expert, Madsen, what was excluded was merely, and quite correctly, his speculation as to Monsanto's state of mind and motives. And that, I think, is black-letter law that somebody can't come in and speculate about that. I'm sorry. You've given me two different answers. Either it's relevant or it isn't relevant. It's irrelevant to any issue before this court. The exclusion of that portion of his testimony. Correct. Why? Because, as the court noted, evidence concerning the historical knowledge of PCBs, PCB toxicity, PCB's volatility came in through historical documents without Dr. Madsen's speculation as to what Monsanto was thinking when they were writing these documents. And those documents came in and are part of a record before the district court and a part of the record before this court. In addition, plaintiffs have not challenged that exclusion in this court and, therefore, its weight. So the admission that is significant is both of their healthcare experts, Dr. Olson, the toxicologist, and Dr. Herrick, said that there is no scientific evidence even today that purports to demonstrate that PCBs volatilizing from building products cause harm. Now, why is that important? Why is that fatal? It is for three reasons, I would suggest. Number one, the claim that plaintiffs prosecuted, they filed and prosecuted in the court below and ultimately they failed to prove, was that the reasonably foreseeable danger was that PCBs would volatilize and create a harmful condition that required remediation. It is the same claim that they are prosecuting before this court. In their brief, they say at page 11, indeed, the presence of PCBs would not be considered contamination if they were benign substances. They further state at pages 9 and 10, that the reason why they had to incur costs was that PCBs made the building unsafe and that the EPA would have forced them to remove it. And as the court has indicated, I'm sorry, Your Honor. You know, I'd like to go back to the foreseeability issue. Way back when Monsanto did the paint test, that said to them it's not a good thing to put it into paint. Why did that not raise a duty for them to take a further look, knowing that all of this was going into a variety of building products? Sure. For the reasons set forth in plaintiff's expert's testimony. The paint in question was a experimental latex paint. PCBs, the record will show, PCBs are hydrophobic and obviously it didn't make sense putting PCBs in a paint that's water-based. So that was never marketed. But it is not the fact of volumization. It is the rate of volumization that will determine whether concentrations might be reached in the air that might be harmful to people. So in the 1950s, they did this test. What plaintiff's expert said was, and we asked them, paint versus caulk. It's the material that counts. And what controls volatility are the co-constituents of the paint versus caulk. But hold it together. Correct. The thickness that is applied, a thin coat of paint versus a thick bead of caulk. The surface area exposed to air, a thin line of caulk versus an entire surface of a room. All of these things affect volatility. And that is why it is essentially apples and oranges. That is why a reasonable formulator, a step removed from us, or a reasonable manufacturer, us, would not think that because PCBs volatilize from paint at a certain rate, they will also volatilize from PCBs at the same rate from caulk. Indeed, plaintiff's experts listed 10 or 11 reasons why we wouldn't think that. Just so I understand, does that mean the evidence does support the conclusion that PCBs can escape from a substance at a rate high enough to cause property damage, in other words, to require remediation? Is that what you're saying? No. What I'm saying is that in the 1950s, basically they painted certain surfaces at a Monsanto plant under very strange conditions. There was no ventilation. It was over 80 degrees Fahrenheit and so forth. And they went in and they tried to measure PCBs in the air. The problem is, and this is basically admissions from their chemical expert, the problem was that the technology at the time did not allow the instrument to detect or to distinguish chlorine molecules coming from PCBs versus chlorine molecules that came from solvents, pesticides, cleaning materials. So in other words, the evidence at the time in the 1950s was, for certain substances we know lots of PCBs can get into the air. For certain substances. But we don't know how bad that is. Correct? No. I don't think that is correct. I think plaintiff's experts, basically, this is what they said. They said that one of the factors in terms of how much they will volatilize is vapor pressure. And plaintiff's expert, Dr. Madsen, said Monsanto's PCBs had very low insignificant vapor pressure. There was every reason to believe that in caulk and in other substances, you would not have volatilization at any rate that could possibly cause injury. So basically, in the absence of plaintiff's expert testimony that even today, even today there is no scientific evidence that PCBs volatilizing from any building material, paint, caulk, you name it, cause injury, how can they establish that it was reasonably foreseeable in 1969? I think there might, go ahead. Wasn't it reasonably foreseeable at some point that some government agency might say that if you have these substances which get into the air and which we know when people handle them can cause a health problem, that some government agency might say, you're going to have to remove this. And isn't that the property damage? No, I don't think that there was any evidence presented before the district court that would allow the district court to have found that Monsanto could have predicted that seven years hence the Congress would enact a statute. I mean, we can't predict what Congress will do next week. That then three years after that, a government agency that did not exist in 1969, the EPA, would enact regulations that would say thus and so. There is no factual basis for the court to have decided that that would have been reasonably foreseeable. Can I just, tell me with this, I can imagine three states of mind. One, I know the amount of PCBs that are going to get into the air will cause human health. All parties seem to agree there was no such evidence in 1969 of that state of mind. Right? Well, Your Honor, respectfully, I don't agree with the premise of that statement that we know that there is a certain level that will cause health problems. That is a possible state of mind one could imagine. Plato could contemplate such a person having a state of mind like that. All parties to this dispute agree Monsanto did not have that state of mind. Correct. Okay, the opposite state of mind would be Monsanto moved to a certainty that the amount of PCBs that would escape would not cause harm to human health. Correct. Correct. Are you saying that was Monsanto's state of mind? Yes. Or were you saying there is a separate state of mind which is a middle case, which is Monsanto had no knowledge one way or the other because one couldn't acquire such knowledge at the time as to whether the amount of PCBs that were escaping into the air would cause harm to human health. Do you see the difference between them? I do. I think their theory depends on the second state of mind being the case. Monsanto didn't know that it was going to be harmful, but they weren't sure it was safe. And they passed that risk on to them. Now, maybe they're wrong in that, but that to me seems like the strongest version of their case. So what's your answer to that? Well, two things. Number one, we had every reason to believe that PCBs, an extremely stable chemical once incorporating the caulk, which is the product in question in this case, would not volatilize at harmful levels. We had experience in our workforce where guys were up to their armpits in PCBs for years after years, and we didn't have health issues. So basic rule of dose response, if we're not seeing health effects at levels up here, why would we expect levels down there for the few minute molecules that might come out of the solid matrix of caulk? There are other responses that I can make, but I think that yours is easier. There is a suggestion made in your opponent's briefs, but not an oral argument, that once Monsanto did the paint studies, that it declined to further study the effect of PCBs in its other products such as caulk because it predicted it wouldn't like the outcome. I mean, you saw the theme in the briefs. I appreciate the court answering that question, and it wasn't adequately addressed in our brief, and I would like the opportunity to address it now. It is uncontradicted, and frankly, the discussion in my learned opponent's brief is a little misleading on this. It is uncontradicted that Monsanto sponsored over 300 toxicological tests of PCBs through the 1970s, even after we stopped selling it for plasticizer use. They included everything from skin patch tests in laboratory animals to cancer tests, to teratology tests, you name it. And the suggestion that we stop testing in 1955 is simply contradicted by the record. I'm sorry. Maybe I'm missing something. I don't think they're a representation that you stop testing whether PCBs in principle are harmful. I thought they were trying to test whether in certain substances... In other words, you found there was a problem with the paint. Stopped. There's no similar study with respect to caulk. Is that right? No, that's not true. There was a study of caulk? Well, what we did was we tested, and our customers tested caulk for what's called weight loss tests to see what was volatilizing. And we passed those tests on to our customers, and according to plaintiff's expert, Dr. Matson, as of 1967, federal specifications required formulators to test their caulk for weight loss under chamber tests. How much are you losing under high temperatures? So the behavior of PCBs in caulk was tested by us and tested by our customers and required under federal law at least as of 1967, according to plaintiff's expert, Dr. Matson. Now, what the documents that are referred to in Plaintiff's Counsel relate to were tests performed at Kettering Institute where we were trying to determine threshold levels for occupational exposures in the air. And what those documents say is we have those test results now. They've been accepted by the American Conference of Governmental Industrial Hygienists. Why pursue those tests further in terms of testing air concentrations to see at what point laboratory animals get sick? So that was the context of that test, of those tests. But we continue to test cured CBs, and in the context that this court, Judge Barron asked, test volatility of caulk and other PCBs from caulk and other materials. Do you agree with Judge Barron that if they're on the bulk issue, that if that fails, we don't get into this foreseeability issue? I respectfully view it the other way. Foreseeability triggers the existence of a duty, and if there's no duty, then it is not a question of whether we discharge that duty by warning the bulk supplier. But that's because you're the defendant, and as the judge, we get to skip over that. And we can say, we can assume that there was a duty and a breach and all that. Exactly. So that's what Judge Lynch's question is, is it the case that as a court, if we conclude that you're right about the bulk sale point, plaintiff can't win? That's correct. That means that we discharged our duty to warn. And just briefly, to respond to counsel's argument, they developed no factual record as to how PRC would know of the Westport Middle School. There's no factual record that would have permitted the district court to have decided that as required under Hoffman, that Westport Middle School was identifiable. The only evidence of record was of a rather torturous supply chain where we would sell PCBs in 55-gallon rooms. We could sell them to makers of polymers who would incorporate them in PCBs, who would then sell them to formulators who would make caulk out of it, who would then sell it to perhaps a distributor, who might sell it to another distributor, who might sell it to a wholesaler, who might sell it to a retailer, who might sell it to a contractor. Thank you. Any further questions? No. Thank you both. I believe you did not reserve time. Okay. Then the court is going to take a brief recess before the next argument.